IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

DAVE BRYANT, *et al.*,⁣     )
                        )
      Plaintiffs,     )
                        )
      v.             )     CASE NO. 2:14-CV-1074-WKW
                        )           [WO]
COMMUNITY BANKSHARES,     )
INC., *et al.*,     )
                        )
      Defendants.     )

## MEMORANDUM OPINION AND ORDER

## I. INTRODUCTION

Defendant Community Bankshares, Inc. ("Bankshares"), maintained an Employee Stock Ownership Plan ("ESOP" or "Plan"). The ESOP, which was invested primarily in Bankshares's stock, was a retirement plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA"). *See* 29 U.S.C. §§ 1001, *et seq.* Plaintiffs Dave and Vikki Bryant were participants in the ESOP. In April 2009, having met the age and participation requirements, Plaintiffs were eligible to diversify a percentage of the employer stock in their individual ESOP accounts. They contend that Bankshares, as the Plan administrator, failed to follow the Plan's directives to implement their diversification elections by June 30, 2009, and to distribute shares of stock, which would have been subject to a put option binding against Bankshares based upon the preceding year's stock valuation of

$11.00 per share. Instead, Bankshares suspended implementation of the diversification elections until after (1) an interim valuation revealed that in September 2009 the stock's worth had plummeted to $2.30 per share and (2) Bankshares and the Federal Reserve Bank had entered into a written agreement that prohibited Bankshares from redeeming put options. Thereafter, against this bleak backdrop, in November 2009, Bankshares offered to issue stock in satisfaction of the diversification elections but informed participants that it would not honor the put options. Bankshares also gave participants the option to change their 2009 diversification elections in light of this new information; however, Plaintiffs contend that this offer to receive the illiquid stock of a failing bank and the resultant tax liability presented no choice at all. Thus, Bankshares deprived Plaintiffs of their rights under the Plan to receive a distribution of shares and to exercise a put option, which would have required Bankshares to buy back the shares based upon the preceding year's stock valuation of $11.00 per share. The stock is now worthless.

The Plan administrator defends its decision, contending that, given Bankshares's deteriorating financial condition, it acted in the best interests of all Plan participants by refusing to honor 2009 diversification elections, which under the Plan would have been subject to put options at the preceding year's stock valuation. It further contends that, in November 2009, the Bryants voluntarily

submitted new diversification elections to keep their stock in the Plan and that these new elections voided their April 2009 diversification elections.

This is the Bryants' second ERISA action against Bankshares and the Plan's fiduciaries to enforce Plan rights and obtain benefits under 29 U.S.C. § 1132(a)(1)(B).[1] Before the court are the parties' cross-motions for summary judgment. (Docs. # 57, 58.) On the § 1132(a)(1)(B) claim,[2] Plaintiffs' motion for summary judgment is due to be granted, and Defendants' motion for summary judgment is due to be denied. As to Defendants' motion for summary judgment on Plaintiffs' request for attorney's fees, the motion is due to be granted, and Plaintiffs' competing motion for summary judgment is due to be denied.

## II. JURISDICTION AND VENUE

The court exercises subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e). The parties do not contest personal jurisdiction or venue.

---

[1] The first action suffered dismissal for the Bryants' failure to exhaust their administrative remedies under the Plan. The Bryants now have exhausted their administrative remedies.

[2] While the Bryants also brought claims alleging breaches of fiduciary duties under 29 U.S.C. §§ 1132(a)(2), and 1132(a)(3), they have conceded the merits of Defendants' summary judgment motion on these claims and move to "voluntarily dismiss" them. (Doc. # 62, at 25.) These claims require no further discussion, and, on the Bryants' motion, dismissal with prejudice is appropriate.

# III.  STANDARD OF REVIEW

The parties advance the issues in this ERISA action through cross-motions for summary judgment.  In the typical case, summary judgment is appropriate when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  This is not the typical case, however.  It is an ERISA action where the material undisputed facts are part of an administrative record[3] and where Rule 56 provides the procedural mechanism for disposing of legal issues; hence, the court "sits more as an appellate tribunal than as a trial court."[4]  *Curran v. Kemper Nat'l Serv., Inc.*, No. 04-14097, at *7, 2005 WL 894840 (11th Cir. Mar. 16, 2005).

The Eleventh Circuit, following guidance from the United States Supreme Court, has developed a six-step process to guide the district court's review of a plan administrator's benefits-denial decision and that review hinges on whether the plan gave the administrator discretion to deny the claim.  *See Blankenship v. Metro. Life*

---

[3] Although the parties expend much energy identifying facts in the oppositional briefing that they say are in dispute, these facts are not material for resolution of the § 1132(a)(1)(B) claim.

[4] Because the parties have invoked Rule 56, the analysis proceeds under the rule's strictures.  *But see Doyle v. Liberty Life Assur. Co. of Boston*, 542 F.3d 1352, 1363 n.5 (11th Cir. 2008) (noting that, where the district court reviews the administrative record in an ERISA benefits-denial case, the preferred course of action may be for the district court "to take the case under submission and enter findings of fact and conclusions of law" and bypass the seeming "unnecessary step" of summary judgment).

*Co.*, 644 F.3d 1350, 1355 (11th Cir. 2011) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989), and *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008)). The court elaborates upon and employs this process in Part V.

## IV. BACKGROUND

A.  <u>Parties</u>

At all times relevant to the events in this litigation, Bankshares had its headquarters in Cornelia, Georgia, and was the holding company of several banks, including Community Bank & Trust–Alabama in Union Springs, Alabama ("Alabama Bank"), and Community Bank & Trust–Habersham in Cornelia, Georgia ("Georgia Bank").[5] Mr. Bryant was the president and chief executive officer of the Alabama Bank and the vice chairperson of its Board. His spouse, Plaintiff Vikki Bryant, was an employee of the Alabama Bank.

Bankshares maintained an ESOP for its employees and for the employees of affiliated employers, and Plaintiffs were participants in the ESOP. The Plan established a trust fund to hold the assets of the Plan and delegated the operation and management of the Plan and the trust fund to fiduciaries. The individual Defendants—Steven C. Adams (now his estate); Elton S. Collins; Edwin B. Burr;

---

[5] Bankshares since has restructured and moved its headquarters to LaGrange, Georgia.

Wesley A. Dodd, Jr.; William R. Stump, Jr.; and Mary Wilkerson—had fiduciary responsibilities for the administration of the Plan and Trust. Dodd, Stump, and Wilkerson served, successively, as the Plan administrator's appointees, and the Plan named Adams, Burr, and Collins as trustees.[6] (*See* Plan, §§ 1.19, 1.29, 1.35.)

The Plan administrator, whom the Plan designated as Bankshares or as individuals or entities appointed by Bankshares, "ha[d] sole responsibility for the administration of the Plan." (Plan, §§ 1.29, 7.1.) The Plan trustee "ha[d] sole responsibility for management of the assets held under the Trust." (Plan, § 7.1.) However, "[n]o Fiduciary guarantees the Trust Fund in any manner against investment loss or depreciation in asset value." (Plan, § 7.1.)

## B.   The ESOP

### 1.   *Generally*

An ESOP is a "defined contribution plan" that is "designed to invest primarily in qualifying employer securities." 26 U.S.C. § 4975(e)(7). It is "a type of pension plan intended to encourage employees to make their employees stockholders." *Steinman v. Hicks*, 352 F.3d 1101, 1102 (7th Cir. 2003).

---

[6] The record contains scant evidence concerning Adams, Burr, and Collins.

Bankshares established and maintained the ESOP through a written instrument that defined the terms of the Plan and the rights of participants. Bankshares was the sole source of funding for the Plan and made annual contributions to the trust, which invested primarily in Bankshares's stock and secondarily in cash. Eligibility to participate in the Plan required an employee's completion of one year of service during which the employee had worked at least 1,000 hours. In 2009, there were 459 participants in the Plan.

## 2.     *The Plan Provisions*

The focus of this litigation is on the Plan's terms governing an eligible participant's rights to diversify his or her individual account investments (§ 8.3) and to exercise a put option on the distribution of employer stock in satisfaction of a diversification election (§ 5.8). The interplay between these two provisions (which themselves are intertwined) and the provision governing the Plan administrator's fiduciary duties (§ 8.4) also is at issue. Because the Plan administrator and trustees had to discharge their duties in accordance with the Plan provisions, *see* 29 U.S.C. § 1104(a)(1)(A), §§ 8.3, 5.8, and 8.4 are set out verbatim.

Section 8.3 of the Plan titled, "Diversification of Investments," provides:

Each Eligible Participant shall, during any Qualified Election Period, be permitted to diversify the investment of a portion of his Employer Contribution Account in accordance with the provisions of this Section

8.3.  Each Eligible Participant may elect, in a writing delivered to the Plan Administrator within ninety (90) days after the close of each Plan Year during the Qualified Election Period, to diversify the investment of twenty-five percent (25%) of such Participant's Employer Contribution Account in the Plan, determined as of the Annual Valuation Date for the Plan Year preceding the Plan Year in which such election is made (to the extent such portion exceeds the amount to which a prior election under this Section 8.3 applies); provided that in the case of the election year in which the Participant is permitted to make his last such election, fifty percent (50%) shall be substituted for twenty-five percent (25%) in applying this Section 8.3.  For purposes of this Section 8.3 a Participant's Employer Contribution Account at the end of any Plan Year shall be deemed not to include any amount contributed to the Plan after the end of such Plan Year, even if allocated as of the end of such Plan Year.

An Eligible Participant electing to diversify his Account shall direct the Plan Administrator to distribute (or transfer to an Individual Retirement Account or another qualified retirement plan) shares of Company Stock, rounded to the nearest whole share, equal to that portion of the Participant's Employer Contribution Account that is covered by the election.  Such transfer or distribution shall be made no later than ninety (90) days after the last day of the Qualified Election Period during which such Participant directed such investment.

No fiduciary of the Plan shall have any liability for investments and reinvestments made under this Section 8.3 pursuant to the direction of an Eligible Participant. The account of an Eligible Participant who directs the investment of a portion of his Employer Contribution Account shall be charged with all costs and expenses of such investment or reinvestment or of any other transaction hereunder at the request of the Participant, as well as all income, gains, losses, etc. attributable to such investment or reinvestment.

(Plan, § 8.3 (Doc. # 57-3, at 18–19).)[7]

---

[7] References to "Doc. #" and page numbers are to those in the court's electronic record.

The Plan also defines the terms in § 8.3. An "eligible participant" is an employee who has attained at least the age of 55 and has at least ten years of participation in the Plan. (Plan, § 1.12.) A "qualified election period" is "[t]he six (6) Plan Year period beginning with the first Plan Year in which the relevant Participant first becomes an Eligible Participant." (Plan, § 1.31.) A "plan year" is a calendar year (Plan, § 1.30), and the Annual Valuation Date is "December 31 of each Plan Year" (Plan, § 1.36).[8]

Under § 8.3, eligible participants were entitled to receive shares of stock only, not cash. But the Plan also gave participants a "put" option that was binding on Bankshares at any time when its stock was not publicly traded. Section § 5.8, titled, "Participant's Right to Put Company Stock to the Company and the Plan," provides as follows:

> (a) General - Any Participant (or his Beneficiary) receiving a distribution of Company Stock from the Plan at a time when such Company Stock is not readily tradeable on an established market shall have a "put option" on such shares, giving him the right to have the Company purchase such shares. . . . The same right shall apply to any Company Stock distributed to a Participant (or his Beneficiary), at a time when such Company Stock is not readily tradeable on an established market. The put option shall be exercisable during the

_____

[8] While § 1.36 permitted Bankshares and the trustee to schedule dates for valuations of the trust's assets and employee account balances and to revise those dates when needed, the Plan fixed "December 31 of each Plan year" as the Annual Valuation Date. (Plan, § 1.36.)

following two election periods by giving notice in writing to the Company:

> (i) the first option period shall be the sixty (60) day period commencing on the date of distribution of the shares of Company Stock; and

> (ii) the second option period shall be the sixty (60) day period commencing on the date the fair market value of the Company Stock is determined (and the Participant or Beneficiary is notified of such determination) as provided for in Section 4.2 for the Plan Year next following the Plan Year in which such shares are distributed.

The Plan may be given the opportunity to purchase shares of Company Stock tendered to the Company under the put option, as described in subsection (c) hereof. Except to the extent otherwise required by law, the put option hereunder shall not apply at any time that the Company Stock is readily tradeable on an established market.

(b) <u>Price and Payment</u> - The price at which the put option shall be exercisable is the fair market value as of the Annual Valuation Date which precedes the date the put option is exercised except in the case of a put option in favor of a "disqualified person" (as defined in Code Section 4975) in which event the fair market value shall be determined as of the date of the transaction. Payment for the shares of Company Stock put to the Company may be made in cash or in installments, not less frequently than annually, over a period not exceeding five (5) years, at the election of the Company. If the purchase price is paid in installments, a reasonable interest rate, reflecting then prevailing market interest rates, must be provided. Closing of the sale shall take place and any installment payments shall begin within thirty (30) days after the put option is exercised.

(c) <u>Right of Plan</u> - The Plan shall have the option by notice in writing to the Company to assume the rights and obligations of the Company under the put option provided for herein at the time the put option is

exercised. The put option provided for hereunder shall not bind the Plan to purchase the Company Stock.  In any case in which the Plan assumes the rights and obligations of the Company under the put option and payment for the stock is to be made in installments, the Company shall guarantee payment of the Plan's obligations to the Seller.

(Plan, § 5.8(a)–(c).)

As the Plan language reveals, §§ 5.8 and 8.3 work together.  To summarize, an eligible participant—one who had participated in the plan for ten years and had attained the age of at least 55 years—could make a diversification election within the 90-day period following the close of each plan year in the six-plan-year qualified election period.  For the first five 90-day annual election periods, the Plan gave an eligible participant the option to diversify 25% of his or her account balance that was invested in employer securities, reduced by any amounts previously diversified.  During the sixth and final 90-day election period in the qualified election period, an eligible participant could diversify 50% of stock shares in his or her account balance, reduced by amounts previously diversified.  The value of the account balance was its value on the Annual Valuation Date.[9]

---

[9] The following hypothetical from the Journal of Taxation illustrates how a diversification election works in practice:

> Jerry, a participant in a calendar-year ESOP maintained by X Corp., is first eligible to make a diversification election in 1989.  The fair market value of X stock was $40 per share on 12/31/88.  As of that date, Jerry's account contained 164 shares of X stock which were contributed to the plan after 1986 (post-1986 stock).  The ESOP must permit Jerry to elect to diversify up to 41 shares (164 x 25%) of

Because Bankshares' stock was not publicly traded on an established market, Bankshares was bound by § 5.8(b).  When a participant received a distribution of Bankshares stock pursuant to a diversification election, the participant could exercise the put option within 60 days after the distribution of the stock or during the first 60 days of the following plan year.  The date of the stock's distribution, thus, triggered the time frame during which a participant could exercise the put option.  The only way for an eligible participant to receive cash for stock distributed pursuant to a diversification election was through the put option.  The price of the shares for purposes of the put option was the fair market value of the shares on the Annual Valuation Date preceding the year in which the participant exercised the put option.  Because the value of the put option was based on the preceding year's annual

---

the post-1986 stock allocated to his account. Jerry must be eligible to make this election through 3/31/89. Jerry makes an election, and receives 41 shares to diversify.

During 1989, X contributes X stock to the ESOP, and Jerry's account receives an allocation of 20 shares.  As of 12/31/89, Jerry's account contains 143 shares of post-1986 stock.  The portion of the account subject to diversification during the 1989 plan year is 25% of 184 shares (164 + 20), or 46 shares, less the shares Jerry has previously elected to diversify, 41. Thus, Jerry must be able to diversify five more shares through 3/31/90.

ESOP Diversification Rules Explained, 69 J. Tax'n 22, 1988 WL 241515, 1; *see also id.* (explaining that "employer securities acquired by or contributed to an ESOP (or a tax credit ESOP) after 1986 are subject to the diversification requirements").

valuation, the value increased when the stock value decreased but decreased when the stock value increased.

There is no Plan language in the section that defines the Annual Valuation Date (§ 1.36) or in § 5.8 that permits Bankshares to use a date other than the Annual Valuation Date when placing a value on Bankshares's stock for purposes of buying back the shares under a put option.[10] But, as Bankshares emphasizes, under § 8.4 of the Plan, the Plan administrator had a general fiduciary obligation to exercise its authority for the benefit of all Plan participants. This section provided that:

> The Plan Administrator, the Investment Committee, the Trustee and any Investment Manager (and any other party who may, at any time be serving as a Fiduciary with respect to the Plan) shall discharge their duties solely in the interest of the Participants, for the exclusive purpose of providing benefits to the Employees as herein described and defraying reasonable expenses of administration, in accordance with the Plan and consistent with the fiduciary responsibility provisions of ERISA Title I, and with the care, skill, prudence and diligence, under the circumstances then prevailing, that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

(Plan, § 8.4.)

---

[10] The only exception pertains to a "disqualified person." There is no contention that either Mr. or Mrs. Bryant was a disqualified person.

**C.**    **The ESOP's Annual Valuation of Bankshares's Stock in 2008**

The Plan required an independent appraiser to conduct a yearly assessment as of December 31 (*i.e.*, the Annual Valuation Date) of the trust fund's fair market value; hence, the value of Bankshares' stock was "its fair market value on such Annual Valuation Date . . . ." (Plan, § 4.2(a).)  To obtain the annual valuation of its shares of common stock as of December 31, 2008, Bankshares hired an independent appraiser, Burke Capital Group ("BCG"), a division of Morgan Keegan and Company.  BCG's report, dated March 20, 2009, and titled, "Determination of the Fair Market Value of the Common Stock of [Bankshares] for ESOP Valuation Purposes as of December 31, 2008," placed an $11.00 per share value on Bankshares's stock.  The report explains that BCG's "[v]aluation is solely of the fair market value of the Company's shares as of December 31, 2008 for ESOP valuation purposes and may be materially different at any date other than the valuation date." (Bankshares's Valuation of Fair Market Value of Common Stock for ESOP Valuation Purposes as of Dec. 31, 2008, at 13 (Doc. # 57-10, at 13).)

**D.**    **Plaintiffs' April 2009 Diversification Elections**

In April 2009, Plaintiffs had satisfied the age and service requirements to qualify to diversify a percentage of the employer stock in their individual ESOP

accounts. Mr. Bryant was eligible to make a 50% election, and Mrs. Bryant was eligible to make a 25% election.

The Bryants each received an ESOP Investment Diversification Notice from Bankshares, dated February 25, 2009. The Notice informed Mr. Bryant that:

> Under the terms of [the Plan], your account balance is invested primarily in stock issued by the plan sponsor. However, the plan allows you to tell the trustee how you want a portion of your plan account invested. You may elect to have this amount (1) paid directly to you, (2) transferred to an IRA, (3) transferred to the [Bankshares's] 401(k) Plan, or (4) remain invested in employer securities under this plan.
>
> The amount subject to your direction is 50% of your account balance invested in employer securities adjusted for any previous distributions, transfers or diversification.
>
> Please complete this form and return it to Wes Dodd no later than April 15, 2009. Your direction will be implemented no later than June 30, 2009.

(Mr. Bryant's ESOP Investment Diversification Notice, at 2 (Doc. # 57-8).) Mr. Bryant checked the option on the Notice "to transfer the shares subject to my election to an IRA." Mrs. Bryant also received a similar Notice, informing her that she had the right to diversify "25% of [her] account balance invested in employer securities." (Mrs. Bryant's ESOP Investment Diversification Notice, at 2 (Doc. # 57-9).) She, like her husband, selected the option "to transfer the shares subject to my election to an IRA." (*Id.*) The signature date on each Plaintiff's Notice is April 14, 2009.

Although the Plan required eligible participants to make their elections by March 31 of each Plan year, the Plan Administrator "allowed participants until April 15 to make their diversification elections." (Stump's Aff., at 3 (Doc. # 58-5).) Presumably, for this reason, the timeliness of the Bryants' diversification elections is not an issue.[11] There also is no dispute that the Bryants properly exercised their rights under the Plan to make a diversification election.

## E. The Bryants' Account Balances as of the December 31, 2008 Annual Valuation Date

The value of the Bryants' accounts as of the Annual Valuation Date (December 31, 2008) is as follows. Mr. Bryant held 9,197.930607 shares of Bankshares stock in his ESOP. The cumulative monetary value of the shares (calculated by multiplying the units of shares by $11.00 per share) was $101,177.24. Mr. Bryant's account also had $8,946.30 in cash. (Mr. Bryant's ESOP Account Balance, at 2 (Doc. # 57-25).) Mrs. Bryant's account held 880.205842 shares of Bankshares stock. The cumulative monetary value of the shares (calculated by multiplying the units of shares by $11.00 per share) equaled $9,682.26. Mrs.

---

[11] The Eleventh Circuit has recognized a plan administrator's right to waive deadlines in an ERISA plan. *See Moody v. Skaliy*, 289 F. App'x 361, 363 (11th Cir. 2008) ("[T]here is no restriction against a plan administrator waiving [an opt out] . . . deadline."); *see also Nazay v. Miller*, 949 F.2d 1323, 1336 (3rd Cir. 1991) (recognizing a plan administrator's authority to waive a certification requirement).

Bryant's account also had $1,704.12 in cash. (Mrs. Bryant's ESOP Account
Balance, at 3 (Doc. # 57-25)).)

**F.    Events Subsequent to June 30, 2009**

In the ESOP Investment Diversification Notices, Bankshares informed
participants it would implement participants' diversification elections by June 30,
2009. That deadline came and went. Then, on September 16, 2009, with
diversification elections still unfulfilled, Bankshares entered into a written
agreement with the Federal Reserve Bank ("FRB") and the Georgia Bank
Commissioner. The written agreement prohibited Bankshares from purchasing or
redeeming its stock without prior consent from the FRB and the Bank
Commissioner.

**G.    The September 30, 2009 Special Valuation**

Suspecting that the value of its stock had declined markedly, Bankshares hired
BCG to prepare a special valuation of the fair market value of its common stock. On
October 23, 2009, Bankshares received the valuation, which revealed that, as of
September 30, 2009, Bankshares stock value had plummeted to $2.30 per share.
(ESOP, eff. 10/30/2009 (Doc. # 57-11).) According to Defendants, "[t]he September
2009 Special Valuation supplemented and revised the December 2008 Annual
Valuation"; however, as discussed later in this opinion, Defendants do not point to

any provision in the governing Plan, and the court found none, that permitted a re-valuation for purposes of implementing diversification elections or for valuing put options. (Defs. Resp. to Interrog. No. 19 (Doc. # 64-1, at 10).) Also, around this time, Bankshares's Vice President of Human Resources Mary Wilkerson became the Plan administrator and orally informed Mr. Bryant that the Plan would not be implementing any of the participants' April 2009 diversification elections. (Mr. Bryant's Dep., at 16–19 (Doc. # 57-28).)

**H.    The November 2, 2009 Letter from Bankshares to the ESOP Participants and Plaintiffs' November 30, 2009 Diversification Requests**

In a letter dated November 2, 2009, Bankshares notified all Plan participants of the results of the special valuation and the stock's $2.30 per share value. This letter informed Plan participants that the ESOP did not "have enough cash, or the ability to raise additional cash, to implement fairly participants' diversification elections, given the obligation to operate the ESOP in the interests of all participants and beneficiaries." (Bankshares's Nov. 2, 2009 Update on ESOP Issues (Doc. # 57-13).) The letter provided notice to the Bryants that: (1) The Plan would "honor" prior diversification elections, but that distributions would be in shares of common stock only; (2) that the ESOP would not offer a put option on stock distributions; (3) that Bankshares would reinstate the put option when the Federal Reserve Bank

lifted the restriction on Bankshares from redeeming its shares of stock, but that the price of the put option would be based on the "fair market value at that time and in accordance with such rules as the Plan Administrator may establish." (Bankshares's Nov. 2, 2009 Update on ESOP Issues (Doc. # 57-13, at 3–4).) The letter further warned Plan participants who opted to make diversification elections that the distribution of common stock would be a taxable event, but that Plan participants could "rollover the distribution to an IRA and avoid current taxation." Finally, Bankshares informed participants that the ESOP would permit participants to change their current diversification election based on the then-current financial situation.

In conjunction with the foregoing letter, Bankshares sent each Plaintiff another ESOP Investment Diversification Notice. It was the same Notice dated February 25, 2009, but the February 25, 2009 date was marked through and replaced with a handwritten date of November 30, 3009. Both Plaintiffs filled out this form and elected for their shares to remain invested in the Plan. (Docs. # 57-14, 57-15.) Because Plaintiffs did not receive a distribution of stock after making their April 2009 diversification elections, they did not have the opportunity to exercise a put option.

## I.    The Collapse of the Bank and Its Aftermath

On January 29, 2010, the Georgia Department of Banking and Finance closed the Georgia Bank and named the FDIC as receiver.[12]  Between September 30, 2009, and December 31, 2009, the value of Bankshares's stock dropped from $2.30 to $0.15 per share.

On or about June 23, 2011, Mr. Bryant received a distribution of the cash in his ESOP account, totaling $8,806.53, and Mrs. Bryant received a distribution of the cash in her ESOP account, totaling $1,667.31.  The Bryants' stock remains in their ESOP accounts, but it is worthless.

In 2012, Bankshares's board of directors became the Plan administrator.  As of March 29, 2012, Bankshares's board of directors had voted to terminate the Plan; however, on May 28, 2016, the date Stump signed his summary judgment affidavit, the termination still was not effective.  (Stump's Aff. ¶¶ 3, 38 (Doc. # 58-5); *see also* Minutes, Bankshares Bd. of Directors Meeting, 03/29/2012 (noting that a request to terminate the Plan had been filed with Internal Revenue Service (Doc. # 58-5, at 19).)  Because the Plan appears for all practical purposes to be defunct, references in this opinion to the Plan are in the past tense.

---

[12] The branch bank in Union Springs where the Bryants worked did not close at that time.

**J.**     **Plaintiffs' First Lawsuit and Exhaustion of Administrative Remedies**

On June 29, 2012, Plaintiffs filed their first ERISA lawsuit in this court against Defendants. (*Bryant, et al. v. Community Bankshares, et al.*, No. 2:12-CV-562-MEF (M.D. Ala. June 29, 2012).) The action was dismissed on March 3, 2014, without prejudice, for Plaintiffs' failure to exhaust their administrative remedies. Subsequently, the Bryants initiated the administrative review process.

By letter dated March 12, 2014, Plaintiffs' counsel submitted a written claim to the Plan administrator under § 7.3 of the Plan, asserting that the "crux of [Plaintiffs'] claim is that [the Plan administrator] had a contractual obligation to diversify the Bryants' accounts and failed to do so."[13] (Pls.' March 12, 2014 Claim for Benefits, at 3 (Doc. # 1-9).) Plaintiffs asked for specified monetary relief, which they calculated based on 50% of the value of Mr. Bryant's account and 25% of the value of Mrs. Bryant's account. The Plan Administrator, in letters dated June 9, 2014, separately denied each Plaintiff's claim:

> Ordinarily, the Plan Administrator would have been obligated to implement [the Bryants'] April 2009 Diversification Request on or before June 30, 2009. At the time, however, [Bankshares's] stock had dramatically declined in value from $11.00 per share in December 2008 to just $5.20 per share in June 2009, and [Bankshares's] financial situation was deteriorating further. [Bankshares] knew that the value of its shares would continue to decrease (and indeed, they fell to just

---

[13] By this time, the Plan administrator was no longer Dodd; Stump had assumed that position.

$2.30 by November 2009.) If the stock had been transferred to [the Bryants'] IRA[s], [Bankshares] was not in a position to honor the put option to repurchase the stock, nor did [Bankshares] have a good valuation for the stock since it was declining so rapidly in value. The Plan also could not distribute cash to [the Bryants] (or other participants electing diversification of their account[s]) for the value of stock because that would have had an adverse effect on other Plan participants. [Bankshares] decided to suspend all diversification requests until it could develop a plan that would be fair and equitable to all Plan participants. [Bankshares] had a fiduciary responsibility to act for the benefit of all participants and [Bankshares] could not honor diversification elections to the detriment of other Plan participants. As a result, [Bankshares] properly concluded that it could not grant [the Bryants'] April 2009 Diversification Request.

[The Bryants'] Claim is also denied because [the Bryants] ultimately elected for [their] shares to remain invested in the Plan. In [their] November 2009 Diversification Request, [the Bryants] voluntarily elected for [their] shares to remain invested in the Plan. [The Bryants] could have directed the Plan to transfer [their] shares to an IRA and the Plan would have done so. [The Bryants] executed [their] November 2009 Diversification Request and submitted it to the Plan Administrator. [The Bryants'] November 2009 Diversification Request[s] revoked [their] April 2009 Diversification Requests[s] and rendered [them] null and void. There is no outstanding request by [the Bryants].

(Bankshares's June 9, 2014 Letters Denying Bryants' Initial Claims (Doc. # 1-10, at 6; Doc. # 1-11 , at 5-6).)

By letter dated August 6, 2014, Plaintiffs' counsel requested a review of the Plan administrator's decisions denying Plaintiffs' claims:

Your letter suggests that the claim is denied because it was impossible for the Bank to diversify the Bryants' accounts without having an

adverse effect on other Plan participants. The Alabama Supreme Court, however, has repeatedly refused to recognize impossibility as a defense to a contract action. As a result, your obligation to diversify the [Bryants'] holdings in June 2009 was absolute. Indeed, the facts you cite in support of impossibility suggest that the Bank chose not to diversify because it did not want to buy its own rapidly collapsing stock. Instead, it let its own employees absorb the blow. There is no legal or factual reason why the Bank could not diversify the accounts before October 14, 2009.

Further, the Bryants' decision to fill out the second diversification request did not approve or ratify the Bank's breach. Instead, the Bryants were mitigating their damages. The Bank sent a letter to the [Plan] participants who had elected to diversify their holdings stating that the Plan did not "have enough cash, or the ability to raise additional cash, to implement fairly participants' diversification elections." You then informed the [Plan] participants that if they intended to pursue diversification, it would take the form of a distribution of common stock which would be taxable to the participants which could not be sold and would not be accompanied by money to cover the tax liability. The Bryants' choice then — as you presented it — was to accept the total loss of the value of the [Plan] or to accept the total loss of value of the [Plan] and incur additional tax liability by acquiring a functionally worthless stock. This, of course, is no real choice, at all.

(Pls.'s Aug. 6, 2014 Admin. Appeal (Doc. # 1-12, at 3–4 (internal citations omitted)).)

Bankshares denied Plaintiffs' appeals in its letters dated October 3, 2014, stating:

As explained in the Denial of [the Bryants' claims], [the Bryants'] April 2009 diversification requests [were] not honored in part because it would have had an adverse impact on other Plan participants. CBI, as the Plan Administrator, had a duty to act for the benefit of all Plan

participants, not just [the Bryants]. Plan § 8.4; see also 29 U.S.C. § 1104(a)(l)(A) ("[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries . . . ."); *Ameritech Benefit Plan Comm. v. Commc'n Workers of Am.*, 220 F.3d 814, 825 (7th Cir. 2000) (recognizing that ERISA's fiduciary duty requires plan administrators to "act in the best interest of all the beneficiaries" such that plan administrators are "not allowed to favor one class of beneficiaries over another"); *Barnhart v. Unum Life Ins. Co. of Am.*, 179 F.3d 583, 589 (8th Cir. 1999) ("Fiduciary obligations extend primarily to the plan as it relates to all beneficiaries, not just to individual claimants.").

CBI could not authorize the distribution of cash to [the Bryants] (or any other participant electing diversification of their account) from the Plan in payment for [their] units in the CBI stock fund because it would have had an adverse effect on the other Plan participants. CBI could not repurchase the stock and the only other party that could have repurchased his stock was the [Plan]. As a result, CBI properly concluded that it could not grant [the Bryants'] April 2009 diversification request.

[The Bryants'] citations to cases regarding impossibility in the context of breach of contract cases under Alabama law are inapplicable here. [The Bryants'] Claim[s] arise[ ] under ERISA and [are] therefore subject to federal law interpreting ERISA plans, not Alabama state law interpreting contracts. Moreover, CBI does not seek to excuse a breach of the Plan on the basis of impossibility. Instead, there is no breach of the Plan because CBI was acting in the best interest of all of the Plan beneficiaries when it declined to honor [the Bryants'] April 2009 diversification request. Accordingly, the Denial of [the Bryants'] Claim[s] is upheld.

. . .

[The Bryants] claim[ ] that [their] November 2009 diversification request was an attempt to mitigate [their] damages. At the time CBI received [the Bryants'] November 2009 diversification request, however, CBI reasonably believed that, based upon the information

24

provided to Plan participants in its November 2009 letter, [the Bryants were] voluntarily electing for [their] shares to remain in the Plan and to revoke [their] April 2009 diversification request. As a result, [the Bryants'] November 2009 diversification request nullified and voided [their] April 2009 diversification request[s], and there is no outstanding diversification request by [the Bryants]. For this reason, the Denial of [the Bryants'] Claim is upheld.

(Bankshares's Letters Denying Bryants' Admin. Appeals (Doc. # 1-13, at 3–4; Doc. #1-14, at 3–4).)

## K.  The Present Lawsuit

After exhausting their administrative remedies with unsuccessful results, the Bryants brought this action. This case proceeds on a claim under § 1132(a)(1)(B). The claim alleges: "Under the Plan, Mr. Bryant had the right to diversify 50% of his holdings out of Bankshares stock into his IRA. Ms. Bryant had the right to diversify 25% of her holdings. The Bryants elected to exercise their right to diversify. Bankshares Plan Fiduciaries including Plan Administrators and Trustees failed to diversify Bryant's holdings." (Compl. ¶ 27 (Doc. # 1).) The Bryants seek "actual and punitive" damages, costs, and attorney's fees. (*Id.*)

## IV. DISCUSSION

In *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989), the Supreme Court held that § 502(a)(1)(B) claims challenging the denial of benefits based on plan interpretations are subject to *de novo* review "unless the benefit plan gives the

administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."[14]  *Id.* at 115.  When the plan confers discretion, judicial review of the exercise of that discretion is limited to whether the decision was arbitrary or capricious.  Following the guidance of the Supreme Court, the Eleventh Circuit has developed a six-step process for judicial review of a plan administrator's benefits-denial decision:

> (1)     [a]pply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

---

[14] At issue in *Firestone* was a "claim for benefits," which is enumerated in the first clause of § 1132(a)(1)(B), but Plaintiffs rely on § 1132(a)(1)(B)'s second clause that permits an action "to enforce . . . rights" under a plan.  (Compl., at ¶ 27.)  A cogent argument can be made that the claim is better categorized as one for benefits:  Plaintiffs are suing for stock shares that are subject to a diversification election and a put option, and those undistributed shares are benefits provided by the Plan.  *See LaRue v. DeWolff, Boberg & Assocs., Inc.*, 552 U.S. 248, 257 (2008) (Roberts, C.J., concurring) (Because the participant sought "the benefits that would otherwise be due him if, as alleged, the plan carried out his investment instruction," his claim "is a claim for benefits that turns on the application and interpretation of the plan terms, specifically those governing investment options and how to exercise them."); s*ee generally Cox v. Keystone Carbon Co.*, 894 F.2d 647, 650 (3d Cir. 1990) (explaining that, under § 1132(a)(1)(B), a plan provides rights that are distinct from the recovery of benefits, such as the right to an appeal process that cannot be denied).  However, Defendants have not challenged the categorization of Plaintiffs' claim or pointed to any barrier precluding *Firestone*'s application.  Both sides steadfastly and consistently have applied *Firestone* during the various phases of this litigation as has the Magistrate Judge without objection from the parties.  Accordingly, this court also applies *Firestone*.  Moreover, at bottom, Plaintiffs' claims center on an interpretation of Plan terms, claims that the U.S. Supreme Court has recognized are appropriate for review under *Firestone*'s principles.  *See Aetna Health Inc. v. Davila*, 542 U.S. 200, 210 (2004) ("Any dispute over the precise terms of the plan is resolved by a court under a de novo review standard, unless the terms of the plan "'giv[e] the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.'" (quoting *Firestone*, 489 U.S. at 115)).

26

(2)     If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse decision.

(3)     If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard);

(4)     If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest;

(5)     If there is no conflict, then end the inquiry and affirm the decision.

(6)     If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

*Blankenship*, 644 F.3d at 1355.

## A.     <u>Steps One and Two</u>

Plan language giving the plan administrator "full and exclusive authority to determine all questions of coverage and eligibility," as well as "full power to construe the provisions of [the] Trust," confers the requisite discretionary authority on the plan administrator to trigger review under the arbitrary-and-capricious standard of review. *Guy v. Se. Iron Workers' Welfare Fund*, 877 F.2d 37, 38–39 (11th Cir. 1989) (listing the "'fair reading' and reasonableness of" a plan administrator's interpretation as a relevant factor under the arbitrary-and-capricious

standard of review).  The parties agree that § 7.3 of the Plan gave the Plan administrator discretion to interpret the Plan's terms and, therefore, that § 7.3 requires an evaluation of Plaintiffs' § 1132(a)(1)(B) claim under the arbitrary-and-capricious standard of review.  (Plan, § 7.3 (conferring on the Plan administrator "the sole and exclusive discretionary power to construe and interpret the Plan, and to determine all questions that may arise thereunder . . . , including the amount of benefits to which any Participant or beneficiary may become entitled hereunder . . .").)

Having determined that the Plan gives a clear grant of discretion to the Plan administrator in reviewing claims (step two), the court will bypass step one and proceed directly to step three.  The Eleventh Circuit also has taken this shortcut.  *See Till v. Lincoln Nat'l Life Ins. Co.,* No. 16-14799, 2017 WL 393257, at *2 (11th Cir. Jan. 30, 2017) (skipping step one of the *Firestone* analysis and focusing on the ultimate issue of whether the denial of benefits was arbitrary and capricious); *see also Emery v. Am. Airlines, Inc.*, 56 F. Supp. 3d 1284, 1289 (S.D. Fla. 2014) (same).

## B.  <u>Step Three</u>

At step three, the issue is whether based upon the information known to the Plan administrator when the final decision was made, the Plan Administrator's resolution of Plaintiffs' claim was "arbitrary and capricious" or an "abuse of

discretion." *Blankenship*, 644 F.3d at 1355 n.5 (noting that the phrases "arbitrary and capricious" and "abuse of discretion" are interchangeable in an ERISA case (citing *Jett v. Blue Cross & Blue Shield of Ala., Inc.*, 890 F.2d 1137, 1139 (11th Cir. 1989))). The arbitrary and capricious standard of review applies to "both the administrator's construction of the plan and concomitant factual findings." *Paramore v. Delta Air Lines, Inc.*, 129 F.3d 1446, 1451 (11th Cir. 1997).

"When conducting a review of an ERISA benefits denial under an arbitrary and capricious standard . . . , the function of the court is to determine whether there was a reasonable basis for the decision, based upon the facts as known to the administrator at the time the decision was made." *Jett*, 890 F.2d at 1140. A decision is reasonable "even if there is evidence that would support a contrary decision." *Id.* Factors that shed light on the inquiry include: (1) whether the plan administrator's interpretation is contrary to the clear terms of the plan; (2) whether the plan administrator has interpreted the terms uniformly; (3) whether the interpretation of the Plan is reasonable and a fair reading of the Plan; (4) whether the interpretation took into consideration the future financial health of the plan; (5) whether the interpretation renders language in the Plan meaningless or internally inconsistent; (6) whether the plan interpretation complies with governing regulations; and (7) the factual background of the decision, including any indicia of bad faith. *Cagle v.*

*Bruner*, 112 F.3d 1510, 1518 & n.6 (11th Cir. 1997) (delineating factors two through seven); *Dennard v. Richards Grp., Inc.*, 681 F.2d 306, 314 (5th Cir. 1982) (explaining that, "[w]hen the trustee's interpretation of a plan is in direct conflict with express language in a plan, this action is a very strong indication of arbitrary and capricious behavior"); *Guy v. Se. Iron Workers' Welfare Fund*, 877 F.2d 37, 39 (11th Cir. 1989) (fair reading).

Although the Plan administrator's interpretation of the Plan under the arbitrary-and-capricious standard of review is entitled to a high level of deference, the standard is not toothless. *Till v. Lincoln Nat'l Life Ins. Co.*, No. 2:14-CV-721, 2016 WL 1631796, at *20 (M.D. Ala. Apr. 25, 2016), *aff'd*, No. 16-14799, 2017 WL 393257 (11th Cir. Jan. 30, 2017). Courts have recognized that a plan interpretation is arbitrary and capricious when the plan administrator "construe[s] provisions of a plan in a way that clearly conflicts with the plain language of the Plan," when the interpretation "renders nugatory other provisions of the Plan," and when the Plan administrator's construction of the provision "lacks any rational nexus to the primary purpose" of the Plan. *Tapley v. Locals 302 & 612 of the Int'l Union of Operating Eng'r-Emp'rs Constr. Indus. Ret. Plan*, 728 F.3d 1134, 1139 (9th Cir. 2013) (internal citations, brackets, and quotation marks omitted). Additionally, "[a] decision is arbitrary and capricious if it was made in bad faith, not supported by

substantial evidence, or is erroneous on a question of law." *Acree v. Hartford Life & Acc. Ins. Co.*, 917 F. Supp. 2d 1296, 1310 (M.D. Ga. 2013). And, as one circuit put it, "[i]n some cases, the plain language or structure of the plan or simple common sense will require the court to pronounce an administrator's determination arbitrary and capricious." *Hess v. Hartford Life & Acc. Ins. Co.*, 274 F.3d 456, 461 (7th Cir. 2001).

Here, some of the reasons Defendants offer to justify the Plan administrator's reasons for denying Plaintiffs' diversification elections were reasons Bankshares articulated to the Bryants during the administrative claims process. Others are new reasons advanced in this litigation. As to the former, while the Eleventh Circuit has not precluded a court's consideration of a *post-hoc* rationale of an administrative denial of a claim for benefits, there may be good reasons to treat that rationale with a dose of skepticism. *See Tippitt v. Reliance Standard Life Ins. Co.*, 276 F. App'x 912, 915 (11th Cir. 2008) (recognizing that "[a] district court may choose not to accord self-serving *post-hoc* explanations much weight . . . , but it is not error to consider them"). In *University Hospitals of Cleveland v. Emerson Elec. Co.*, 202 F.3d 839 (6th Cir. 2000), cited with approval in *Tippitt*, the Sixth Circuit observed the pitfalls of the *post-hoc* rationale:

[I]t strikes us as problematic to, on the one hand, recognize an administrator's discretion to interpret a plan by applying a deferential "arbitrary and capricious" standard of review, yet, on the other hand, allow the administrator to "shore up" a decision after-the-fact by testifying as to the "true" basis for the decision after the matter is in litigation, possible deficiencies in the decision are identified, and an attorney is consulted to defend the decision by developing creative post hoc arguments that can survive deferential review.

*Id.* at 849.

In light of the foregoing principles, the court analyzes both the reasons the Plan administrator articulated in his written decisions denying the Bryants' formal claims and upholding the denials (which are set out in the plan administrator's letters dated June 9, 2014, and October 3, 2014, respectively) and the additional reasons that have surfaced during this litigation. It should be noted that the parties' arguments are long on the recitation of facts, but short on the factual and legal analysis, thus, leaving the court to its own research and analytical devices in assessing whether the Plan administrator's decisions pass muster under the arbitrary-and-capricious standard of review. Ultimately, the court concludes that the Plan administrator's decisions were arbitrary and capricious.

## 1. *The Plan Administrator's Articulated Reasons for the Denials*

Then-Plan administrator Stump informed the Bryants in letters denying their initial claims that, "[o]rdinarily, the Plan Administrator would have been obligated

to implement Mr. Bryant's April 2009 Diversification Request[s] on or before June 30, 2009." (Bankshares's June 9, 2014 Letter Denying Mr. Bryant's Claim for Benefits, at 6 (Doc. # 1-10); *see also* Dodd's Aff., ¶ 12 (Doc. # 58-6 (confirming that, "[o]rdinarily, with the guidance of independent third party advisors, [he] would have implemented the April 2009 Diversification Requests and subsequent purchase of the shares, either through the participant's exercise of the put option or the Plan's election to purchase shares, based on the $11.00 per share value in the 2008 Annual Valuation. This process ordinarily would have been completed on or before June 30, 2009.").) Stump gave four reasons why Bankshares did not implement the diversification requests prior to June 30, 2009. He explained that, "[a]t that time,"

(1) Bankshares' stock had plummeted "from $11.00 per share in December 2008 to just $5.20 per share in June 2009," and Bankshares did not have an accurate current valuation of its stock,

(2) Bankshares "was not in a position to honor the put option to repurchase the stock," and

(3) the Plan alternatively could not purchase the shares tendered to Bankshares under the put option because the purchase would "have had an adverse effect on other Plan participants."

Based on reasons (1), (2), and (3), Stump cited § 8.4 of the Plan and said that Bankshares "decided to suspend all diversification elections until it could develop a plan that would be fair and equitable to all Plan participants."

Concerning the fourth reason (4), the Plan administrator explained that, later in November 2009, the Bryants revoked their April 2009 diversification elections to transfer the shares to their individual retirement accounts and directed Bankshares to keep their shares invested in the Plan, and that there are no longer outstanding diversification elections by the Bryants.  It is appropriate to address reasons (1), (2), and (3) together, followed by a discussion of reason (4).

## 2.    *Reasons (1), (2), & (3)*

The first three reasons underlying Bankshares's decision to suspend implementation of the diversification elections arise from the Plan administrator's belief that by June 30, 2009, the December 31, 2008 annual valuation did not accurately reflect the precipitous drop in Bankshares's stock in 2009.  This meant that the 2008 annual valuation commanded an overinflated price for purposes of the Plan's obligations to implement diversification elections and ensure a participant's right to a put option.   Reasons (1), (2), and (3) implicate Bankshares's duties under

the Plan to implement diversification elections and put option transactions when faced with markedly declining stock values.[15]

These three reasons for the Plan administrator's decisions disallowing the Bryants' proper elections to diversify their investments in their individual ESOP accounts do not survive review under the arbitrary-and-capricious standard. The decisions conflict with the clear, specific, and mandatory terms of the Plan governing stock valuation, a participant's right to make a diversification election, and a participant's right to exercise a put option on distributed shares and, at the same time, render those mandatory terms nugatory. The decisions also construe the Plan in a manner that contravenes the governing federal regulations.

### a.   The Annual Valuation Date

Because the Plan does not contain an exception to the use of the Annual Valuation Date for purposes of implementing diversification elections and transacting put options, it was arbitrary and capricious for the Plan administrator to disregard the December 31, 2008 annual valuation. Where the "plan document unambiguously addresses the valuation procedure, . . . the plan is contractually

---

[15] Recall that Bankshares's distribution of shares in satisfaction of a diversification election was inextricably intertwined with the participant's right to exercise his put option. The date Bankshares distributed the shares dictated when the participant could exercise the put option and, thus, how much the put option was worth.

bound to honor that procedure . . . ." *Pratt v. Petroleum Prod. Mgmt. Inc. Emp. Sav. Plan & Trust*, 920 F.2d 651, 662 (10th Cir. 1990). Under §§ 8.3 and 5.8 of the Plan, the fair market value of the participant's account and of Bankshares's stock is determined as of the Annual Valuation Date for purposes of distributions of stock shares precipitated by diversification elections and put option transactions.

Section 8.3 provided that the participant could elect to diversify a percentage of the investment in his or her account in the Plan, "determined as of the Annual Valuation Date for the Plan Year preceding the Plan Year in which such election [was] made." (Plan. § 8.3.) The Plan, at § 1.36, mandated that the "Annual Valuation Date shall be December 31 of each Plan Year." The Annual Valuation Date also fixed the value of the stock for the put option price. (*See* Plan, § 5.8(b) ("The price at which the put option shall be exercisable is the fair market value as of the Annual Valuation Date which precedes the date the put option is exercised.").) For both diversification elections and put option transactions made in 2009, the December 31, 2008 Annual Valuation Date fixed the value of the stock at $11.00 per share.

Sections 5.8 and 8.3 do not provide an exception or contingency permitting Bankshares to use a date other than the Annual Valuation Date for ascertaining the fair market value of Bankshares's stock and a participant's individual account.

Defendants have not identified any Plan provision that gives the Plan administrator discretion to override the mandatory provisions of §§ 5.8 and 8.3. For instance, when asked, Dodd was unable to point to any language in the Plan to support his supposition that Bankshares did not have to implement a diversification election, which would have triggered the put option, based on the value of the stock on the Annual Valuation Date if the Plan trustees "fe[lt] like the valuation ha[d] changed dramatically." (Dodd's Dep., at 25–26 (Doc. # 57-27).)

The Plan language is clear: The Annual Valuation Date is the sole date that governs valuations for purposes of diversification elections and put option transactions. The Plan language also is mandatory: The Annual Valuation Date "shall be December 31 of each Plan Year." (Plan, § 1.36.) The Plan administrator's construction of the Plan to permit a special valuation in times of Bankshares's financial crisis clearly conflicts with the Plan language.

Notably, the Plan could have made an exception for an alternative valuation date or other contingency plan in unexpected times of financial stress, but it did not. Other courts examining ESOPs have recognized, at least implicitly, the validity of such provisions. *See, e.g.*, *Craig v. Smith*, 597 F. Supp. 2d 814, 821 (S.D. Ind. 2009) (reciting the ESOP provision that assigned the value of stock for purposes of a put option "as of the most recent Valuation Date; unless the Administrator believes that

the value as of the most recent Valuation Date is significantly more than the fair market value of such Employer Stock as of the date of the transaction, in which case, the value of the Employer stock shall be, if permitted under ERISA, the value of such Employer Stock determined as of the date of such transaction"); *Jasper v. M.H. & B.L. Jasper, D.D.S., P.C. Profit Sharing Plan*, 340 F. Supp. 2d 1017, 1021–22 (E.D. Mo. 2004) (discussing a plan provision that permitted the Plan administrator to use a special valuation date for purposes of allocating trust fund earnings among the accounts "to avoid prejudice to any Participant under the Plan"); *Mitchell v. Falley's Inc.*, 958 F. Supp. 548, 550 (D. Kan. 1997) (observing that the Plan required an annual valuation of the stock, but allowed an interim valuation when the administrator "believe[d] that the value of the stock has changed substantially since the last valuation" and an adjustment of account balances if the interim valuation revealed a ten percent deviation (plus or minus)).

Moreover, Defendants have cited no authority, and the court has found none, indicating anything unusual about a plan that sets the valuation to occur on an annual basis (instead of more frequent valuations) and on a date that is earlier than the distribution date. When the valuation date precedes the election date, a participant can make an informed decision as to whether to diversify. Because the valuation establishes the number and worth of stock shares in a participant's individual ESOP

account prior to the election period, the participant knows the value of his or her individual account and knows that a distribution of shares would proceed based upon that value. Additionally, cost efficiency may guide a company's decision to have a yearly valuation date. *See Pratt*, 920 F.2d at 661–62 (observing that "plausible reasons exist for [an annual] valuation method" where, for example, the company deems "the expense of obtaining more frequent valuations for these employer securities [to be] too great"); *see also* American Bar Association Section of Taxation Employee Benefits Committee ESOP Subcommittee, Spring 2015 Meeting Washington, D.C., 2015 ABATAX-CLE 0508026, 2015 WL 3792951 (May 8, 2015) ("ESOPs are only required to value the stock once a year and to require otherwise would be overly burdensome on the company and distract the company's leadership from running, improving, and growing the company. The nature of an annual balance forward plan is that balances are static until the next annual allocation date and that activity is reflective of this static balance.").

The selection of an Annual Valuation Date as the price point for diversification elections and put option transactions also reflects a realistic allocation of unknown risks between Bankshares and ESOP participants. For example, Bankshares may have anticipated that its stock value would increase, in which case the participant would have borne the risk; however, unfortunately for Bankshares,

for diversification elections and put options exercised in 2009, Bankshares realized the risk.  In *Pratt*, the Tenth Circuit aptly explained this risk in analyzing a terminated employee's entitlement to a cash distribution of his vested interest in his ESOP account:

> Of course, the difficulty with the plan in existence at the time of plaintiff's termination is that the valuation of the plaintiff's interest in employer securities did not reflect the current market value because it relied upon market value determined in the past.  In a declining market, this constitutes a burden to the plan, however, in a rising market the plan (not the separating employee) would benefit from this feature because the employee would receive only historical market value, not the higher current market value.  We are not free to rewrite the plan to reallocate that risk.

920 F.2d at 661.

Here, the terms governing the timing of the valuation of Bankshares's stock for purposes of ascertaining the fair market value of the stock and the individual ESOP accounts are clear, mandatory, and permit no exception.  This court, as in *Pratt*, cannot rewrite the requirements of the Plan to alleviate the adverse consequences to Bankshares as a result of its allocation of risk.

Defendants' principal contention is that the Plan administrator's reliance on § 8.4 supplies a reasonable basis for its decisions.  This general plan provision requires the Plan administrator to "discharge [his] duties solely in the interest of the Participants" and with the "care, skill, prudence and diligence, under the

circumstances then prevailing." (Plan, § 8.4.) To be sure, the Plan administrator's rationale is not without intrigue as Dodd's prediction of Bankshares's dire economic circumstances was perceptive.[16] The Plan administrator may have considered the greater financial good for the largest number of Plan participants by refusing to implement diversification elections based on the 2008 annual valuation. But, even if it is assumed that Bankshares's intentions were pure, the Plan administrator cannot exercise his fiduciary duties in a manner that eliminates specific and mandatory provisions of the Plan. Under general principles of federal common law, which apply to ERISA plans, "[c]ontract interpretations should, to the extent possible, give effect to all language without rendering any term superfluous, but if both a general and a specific provision apply to the subject at hand, the specific provision controls." *Young v. Verizon's Bell Atl. Cash Balance Plan*, 615 F.3d 808, 823 (7th Cir. 2010). The Plan is specific as to its requirement that the Annual Valuation Date, and no other, governs the fair market value of Bankshares's stock for purposes of §§ 5.8 and 8.3. The Plan also is specific and clear in stating that the "Annual Valuation

---

[16] By mid-September 2009, Bankshares stock had dropped in value by almost eighty percent, and the Federal Reserve Bank's investigation of Bankshares culminated in a written agreement, which prohibited Bankshares from purchasing its shares of stock without the Federal Reserve Bank's prior written approval. Also, one of Bankshares's subsidiary banks (Community Bank & Trust, Cornelia, Georgia) was under a cease and desist order from the Federal Deposition Insurance Corporation and that bank ultimately failed.

Date shall be December 31 of each Plan Year." (Plan, § 1.36.) Section 8.4, on the other hand, is a general provision that contains no reference to either § 5.8 or § 8.3 and no language that would permit the Plan administrator to make an exception to those provisions' mandatory terms. The Plan administrator derives no authority from § 8.4, or any other Plan provision, to alter the terms of the Plan or to compromise benefits. (*See* Plan, ¶ 7.5 (providing that the "Plan Administrator shall have no power to add to, subtract from or modify any of the terms of the Plan, or to change or add to any benefits provided by the Plan . . . .").) To construe the Plan in the manner urged by Defendants not only contravenes this basic principle of contract interpretation, but also renders the Plan's mandatory provisions in §§ 5.8 and 8.3 meaningless. *See Tapley*, 728 F.3d at 1139. Just as the Plan administrator cannot override specific, mandatory terms, courts also "are without license to alter an express, unambiguous provision, even though that provision results in one participant receiving an amount greater than the appraised value of the employer securities . . . ." *Pratt*, 920 F.2d at 662. Finally, the Plan administrator's interpretation of § 8.4's general admonitions as permitting an override of §§ 5.8 and 8.3 sweeps too broadly and potentially could erect an impenetrable barrier against judicial review under the arbitrary and capricious standard. *See Burditt v. W. Growers Pension Plan*, 636 F. Supp. 1491, 1497 (C.D. Cal. 1986) ("There is no

doubt that any denial of benefits will help preserve a pension fund's financial resources for remaining and future participants. That, however, does not make denial of benefits appropriate in every case. Otherwise, trustee denials of benefits could never be deemed arbitrary and capricious."), *aff'd*, 818 F.2d 698 (9th Cir. 1987). Accordingly, Defendants' arguments that the Plan acted with good intentions do not negate a finding that the Plan administrator acted arbitrarily and capriciously.

### b. The Put Option

Because a participant's right to a put option is mandatory under the Plan and governing regulations, the Plan administrator's decision to obliterate the Bryants' rights to a put option was arbitrary and capricious. The Plan plainly provides that "[a]ny Participant . . . receiving a distribution of Company Stock from the Plan at a time when such Company Stock is not readily tradeable on an established market shall have a 'put option' on such shares, giving him the right to have the Company purchase such shares. . . ." (Plan, § 5.8(a).) There is no serious dispute that the right to the put option was unqualified under the terms of the Plan, and the provisions in § 5.8 governing put options are specific, which for the reasons discussed above, are not subject to override by the general terms of § 8.4.

Moreover, the Internal Revenue Code requires that, if an employer's stock is "not readily tradeable on an established market" (and Bankshares's stock was not),

then the company that sponsors the ESOP must provide a put option right to the participant to sell the shares of stock back to the company. 26 U.S.C. § 409(h)(1)(B) (requiring that, under an ESOP, the participant has "a right to require that the employer repurchase employer securities under a fair valuation formula"). The Plan administrator's interpretation of the Plan in a manner that contravenes federal regulatory requirements governing put option rights in ESOPs is another factor demonstrating the unreasonableness of the Plan administrator's decision. *See Cagle*, 112 F.3d at 1518 (enumerating factors relevant to the analysis of whether a plan administrator acted arbitrarily and capriciously).

### c. The June 30, 2009 Diversification Deadline

Defendants contend that, while the Plan administrator's standard practice was to implement diversification elections within 180 days of the plan year in which an eligible participant made a diversification election (*i.e.*, by June 30, 2009), the Plan did not mandate this deadline.[17] Defendants rely on the last sentence in § 8.3 of the Plan. It provides that the Plan administrator's transfer or distribution of stock subject

---

[17] In their summary judgment briefing, Defendants argue that Plaintiffs did not argue that the Plan deadline for Bankshares to implement their April 2009 diversification elections was June 30, 2009, until this court brought it up at the motion-to-dismiss phase. Defendants are correct that, in a prior opinion, the court noted, without elaboration, that June 30, 2009 was the "deadline for the Plan administrator to implement Plaintiffs' diversification requests," (Doc. # 39, at 14 n.6). But Defendants otherwise are incorrect. In the administrative appeal letters, dated August 6, 2014, Plaintiffs emphasized that Bankshares's "obligation to diversify the Bryant[s'] holding in June 2009 was absolute." (Doc. # 1-12, at 4.)

to an eligible participant's election to diversify his or her accounts "shall be made no later than ninety (90) days after the last day of the Qualified Election Period during which such Participant directed such investment." (Plan, § 8.3.) Because the Plan defines a "qualified election period" as the "six (6) Plan Year period" of eligibility (Plan, § 1.31), Defendants argue that the Plan administrator had until ninety days after the end of the Bryants' six-year eligibility period to implement their diversification elections. Under this Plan construction, for example, because Mr. Bryant was in the last year of the qualified election period, the deadline to implement his April 2009 diversification request would have been 90 days after December 31, 2009 (*i.e.*, March 31, 2010). Hence, Defendants' position, distilled to its essence, is that the Plan administrator had a reasonable basis to opine that June 30, 2009 was a permissive, not a mandatory, Plan deadline, by which it had to implement an eligible participant's diversification election. Plaintiffs contend, on the other hand, that the Plan deadline for Bankshares to implement their diversification elections was the 180th day of each plan year of the qualified election period in which they made an election, *i.e.*, June 30, and that the Plan administrator acted arbitrarily and capriciously in failing to implement their diversification elections by June 30.[18]

---

[18] There is no dispute that the Bryants were eligible participants under the Plan and had a right to diversify the employer securities in their individual ESOP accounts. The deadline for the diversification of elections matters: An eligible participant could not exercise the put option until

The last sentence of § 8.3, when read in isolation, appears to support Defendants' Plan construction that the clock starts ticking for the implementation of diversification elections at the end of the six-year qualified election period. But context can mean a lot, and there are at least four reasons why it does here.

First, Defendants' argument that the June 30 deadline was a self-imposed, rather than a contractual, deadline surfaced for the first time in this litigation. The reasons that follow will show why the court does not assign much weight, if any, to Defendants' *post-hoc* construction of § 8.3. *See Tippitt*, 276 F. App'x at 915 ("A district court may choose not to accord self-serving *post-hoc* explanations much weight . . . , but it is not error to consider them.").

Second, the Plan administrator consistently interpreted June 30 as a mandatory deadline, beginning in February 2009 and continuing through the Bryants' administrative review process. Initially, in the Investment Diversification Notice, dated February 25, 2009, Bankshares informed participants that "[y]our direction [for diversification] will be implemented no later than June 30, 2009." (ESOP Investment Diversification Notice (Docs. # 57-8 and 57-9).) In the letters

the Plan administrator distributed the shares in satisfaction of the diversification; hence, the date of the distribution of the shares triggered the valuation date for the put option. (*See* Plan, § 5.8(b) ("The price at which the put option shall be exercisable is the fair market value as of the Annual Valuation Date which precedes the date the put option is exercised.").)

denying the Bryants' initial claims, the Plan administrator did not label the June 30 deadline as a time-honored, but non-obligatory, practice that Bankshares would no longer be able to accommodate. Rather, the Plan administrator acknowledged that, "[o]rdinarily, the Plan Administrator *would have been obligated* to implement [the Bryants'] April 2009 Diversification Request[s] on or before June 30, 2009." (Bankshares's June 9, 2014 Letters Denying Bryants' Claims for Benefits ("June 2014 Letters" (emphasis added) (Doc. # 1-10, at 6; Doc. # 1-11, at 5); *see also* June 2014 Letters, at 2 ("Upon receipt of a diversification request, the Plan Administrator was supposed to distribute shares of CBI's stock equal to the portion of the Plan account covered by the request . . . ." (citing Plan, § 8.3).) An obligation is binding; it is not permissive. The logical source of the Plan administrator's obligation is the Plan, and Defendants have not suggested another source.[19]

Again, in the letters rejecting the Bryants' administrative appeals, the Plan administrator did not take the position that the June 30 deadline was permissive. He acknowledged June 30, 2009 as the deadline, but articulated that adherence to that

---

[19] Defendants have not argued or pointed to any evidence that a Plan administrator in any other plan year interpreted § 8.3 as not obligating Bankshares to implement diversification elections by June 30. Similarly, there is no written communication where a Plan administrator stated or implied that the Plan permitted an eligible participant's annual diversifications to accumulate for the entire six-year period, essentially allowing elections to roll over from year to year, prior to the Plan's requiring its administrator to implement diversification elections.

deadline for implementing diversification elections would have been unfair to other Plan participants and not in the best interest of the Plan as a whole based on the falling stock prices. (*See, e.g.*, Bankshares's Oct. 3, 2014 Letter Denying Ms. Bryant's Admin. Appeal ("In April 2009, Ms. Bryant elected to transfer the shares to her IRA and the transfer to her IRA would have occurred on or about June 30, 2009," but for the "deteriorating financial condition of [Bankshares] in 2009" (Doc. # 1-14).)

Defendants posit a different take on the uniform interpretation angle. They argue that the Plan administrator interpreted the Plan consistently because the decision to suspend the implementation of diversification elections pending an interim valuation affected not only the Bryants, but *all* eligible participants who had made diversification elections in the 90-day election period in 2009. This argument avoids mention that the Bryants were eligible for benefits (a distribution of shares subject to a put option at the price-per-share fixed by the 2008 annual valuation), but that the Plan administrator nevertheless declined to honor the diversification elections (and anticipated put options at the $11.00 share price). In other words, the Plan administrator uniformly contravened the Plan when, in 2009, it suspended implementation of all diversification elections exercised in 2009 pending an interim valuation and then suspended the put option. It cannot be that a Plan administrator's

decision becomes reasonable through repetition of a Plan violation. The factor of uniformity of construction does not support Defendants' position that the Plan did not act arbitrarily and capriciously. Uniformity of the Plan administrator's interpretation of the Plan's diversification deadline is a factor that weighs in favor of a finding of arbitrariness and capriciousness. *See Cagle*, 112 F.3d at 1518.

Third, an interpretation of the Plan that Bankshares's distribution of shares subject to a diversification election did not have to occur until 90 days after the end of the six-year qualified election period, rather than 90 days after the last day of the each 90-day election period, is contrary to the Internal Revenue Code and regulations governing ESOPs. *See* 26 U.S.C. § 401(a)(28)(B)(ii) (requiring a trust that is part of an ESOP to effectuate a diversification election within ninety days after it is made); *see also* § 6:2. Employee stock ownership plan—Discussion of Qualified Deferred Comp. Plans Forms § 6:2 (explaining that The Technical and Miscellaneous Revenue Act of 1988, which amended The Tax Reform Act of 1986, "makes it clear that diversification . . . must be completed during the 90-day period after the close of the 90-day diversification election period"). The code and regulations contemplate that the exercise of the diversification election and the distribution of the elected shares will occur in the same plan year. A plan must comply with the substantive minimum standards provided by the Internal Revenue

Code to qualify as an ESOP; hence, whether the Plan interpretation is consistent with the "relevant regulations formulated by the appropriate administrative agencies" is another factor that points to a finding that the Plan administrator's decision was arbitrary and capricious. *Blank*, 926 F.2d at 1093.

Fourth, Defendants' interpretation of the Plan deadline lacks a commonsense foundation. *See Hess*, 274 F.3d at 461 (stating that sometimes "common sense will require the court to pronounce an administrator's determination arbitrary and capricious"). Section 8.3 permits an eligible participant to make up to six diversification elections, one after the close of each plan year of the qualified election period; hence, § 8.3 contemplates a qualified election period containing six distinct units of time for purposes of a participant's right to make a diversification election. Delaying implementation of diversification elections until the end of the six-year qualified election period would eliminate the value of the put option that accompanied a diversification election because it would prevent participants from knowing the value of the put option at the time of the election.[20] Because, according to Bankshares, the distribution did not have to occur until 90 days after the close of

---

[20] The put option brings value to stock shares held by participants by ensuring that, where no public market exists for the stock, the participant can demand that the employer buy back the stock. *See generally Goodin v. Innovative Tech. Sols., Inc.*, 489 F. Supp. 2d 1157, 1168 (D. Haw. 2007) (Where the stock is not publicly traded, "[t]he ability to receive cash for one's shares—as guaranteed by a put option—is a valuable right.")

the qualified election period, an eligible participant would not know how much the company would pay for the shares in the buy-back until the end of the six-year qualified election period. (*See generally* Plan, § 5.8(b) ("The price at which the put option shall be exercisable is the fair market value as of the Annual Valuation Date which precedes the date the put option is exercised.").)

The foregoing analysis demonstrates that the Plan administrator acted arbitrarily and capriciously in failing to implement the Bryants' diversification elections by the Plan's June 30, 2009 deadline. But Defendants offer a final argument against such a finding. They contend that it was reasonable for the Plan administrator to conclude that it could not implement the Bryants' April 2009 diversification elections and anticipated put options *prior to June 30, 2009*, because the Federal Reserve Bank orally had informed him that Bankshares was prohibited from redeeming its stock.[21] (Defs.' Resp. in Opp. to Pls.' Summ. J. Mot., at 56 (Doc. # 61).) This post-litigation argument need not detain the court long, as it did not impede the Plan administrator in his written communications to eligible participants or to the Bryants during the administrative claims review process.

---

[21] Plaintiffs dispute that there was an oral prohibition from the Federal Reserve Bank and point out that the then-Plan administrator (Dodd) has provided conflicting dates as to when he thinks he learned of this oral prohibition. (Pls.' Reply Br. in Supp. Summ. J., at 35 (Doc. # 66).) This factual dispute, as explained, turns out to be an immaterial one.

The ESOP investment diversification notices, dated February 25, 2009, which the Bryants submitted to Bankshares, do not memorialize a restriction orally imposed by the Federal Reserve Bank's on Bankshares's ability to honor a put option should the participant elect for a distribution of stock shares. And the subsequent November 2009 letter from Bankshares to its ESOP participants, revealing the bleak results of the special stock-valuation and informing participants of its decision to suspend put options does not mention an oral directive from the Federal Reserve Bank prohibiting Bankshares from honoring put options. The fact of an oral prohibition from a federal regulatory agency would seem to be a significant reason to relay to participants to explain a Plan administrator's suspension of a put option, had that fact actually motivated the decision.

Additionally, the Plan administrator's letters denying the Bryants' initial claims and upholding the denial on the administrative appeals do not cite the Federal Reserve Bank's oral prohibition as a reason for denying the Bryants' claims. For example, in his letters dated June 9, 2014, denying the Bryants' initial claims, the Plan administrator cited only the written agreement between the Federal Reserve Bank and Bankshares, which prohibited Bankshares from purchasing or redeeming its stock shares, but that agreement did not take effect until September 16, 2009,

several months after the June 30, 2009 deadline had passed.[22] Also, in the same letters, while the Plan administrator stated that, "[a]t the time" (referring to "on or before June 30, 2009"), Bankshares "was not in a position to honor the put option to repurchase the stock," as support for that statement, he enumerates only the dramatically declining value in Bankshares's stock, not a federal governmental agency's oral prescription on stock repurchases. (Bankshares's June 9, 2014 Letters Denying Bryants' Claims for Benefits (Docs. # 1-10, at 6; Doc. # 1-11, at 6).) There also is no indication in the written agreement that an oral prohibition was in place prior to the agreement's effective date. Defendants' reliance, for the first time in this litigation, on a Federal Reserve Bank stock-sale prohibition fails to provide a reasonable basis for the Plan Administrator's refusal to implement the Bryants' diversification requests prior to June 30, 2009.

In sum, the Plan administrator's decision not to implement the diversification elections by June 30, 2009, but to delay implementation pending a new valuation, was arbitrary and capricious based upon the Plan administrator's past consistent interpretations of the Plan's requirements for implementing diversification elections,

---

[22] It is undisputed that Plaintiffs submitted their elections months prior to the effective date of the written agreement, and Defendants tactility concede that the September 16, 2009 written agreement could not have informed the Plan administrator's pre-June 30, 2009 decision to refuse to implement the diversification elections.

the governing federal statutory requirements, a pinch of common sense, and the rejection of Defendants' *post-hoc* rationales.

3.     ***Reason (4)***

Defendants argue that, during the 2014 administrative claims process, the Plan administrator had a rational basis to deny the Bryants' claims to make diversification elections under the Plan because, in November 2009, the Bryants changed their April 2009 diversification elections and opted to keep their shares in the Plan.  Defendants assert that, in light of Bankshares's November 2, 2009 letter informing participants of the suspension of the put option, it was reasonable for the Plan administrator to conclude that the Bryants had "voluntarily elected in writing to have [their] shares remain invested under the Plan" and had "revoke[d] [their] April 2009 Diversification Request[s]."  (Bankshares's June 9, 2014 Letters Denying Bryants' Initial Claims (Doc. # 1-10, at 6; Doc. # 1-11, at 6).)

Plaintiffs contend that the Plan administrator's reliance on their November 30, 2009 diversification elections as nullifying their April 2009 diversification elections is a *post-hoc* justification because these elections did not exist when the Plan administrator originally refused to honor their April 2009 diversification elections by the June 30, 2009 deadline.  Additionally, they argue that the November 2009 elections do not contain a release that would prohibit the Bryants from seeking relief

for the June 2009 breach.  According to Plaintiffs, the choice Bankshares presented in November 2009—to implement their diversification elections but without a put option (meaning they would receive the illiquid common stock of a defunct organization and accompanying tax liability) or to change their election and leave their stock shares in their account)—was a "Hobson's choice" or "no choice at all." (Pls.' Summ. J. Mot., at 21 (Doc. # 57).)

### a.    Scope of the Record

As an initial matter, an issue has arisen as to the scope of the record for this court's review.  "It is well established that in reviewing a denial of ERISA benefits, the relevant evidence is limited to the record before the administrator at the time the decision was made." *Alexandra H. v. Oxford Health Ins. Inc. Freedom Access Plan*, 833 F.3d 1299, 1312 (11th Cir. 2016).  The focus properly is on the phrase, "at the time the decision was made."  Plaintiffs argue that any decision or information obtained after June 30, 2009—the deadline for Bankshares to implement their diversification elections—cannot supply the reason for the Plan administrator's initial refusal to honor the diversification elections by June 30, 2009.  In particular, Plaintiffs contend that the materials for this court's review cannot include the November 2009 diversification elections.  Their argument, in effect, is that the administrative record closed on June 30, 2009.

The argument gets traction from the court's previous statement, at the motion-to-dismiss stage, that "[t]he November 2009 revocations post-date the Plan administrator's [June 30, 2009] contractual deadline for implementing Plaintiffs' prior April 2009 diversification requests and, thus, regardless of the validity of the revocations, were not 'material available to the administrator at the time it made its decision.'" (Mem. Op. & Order, at 14–15 (quoting *Blankenship*, 644 F.3d at 1354)). In retrospect, what the court should have written is that the Bryants' November 2009 diversification elections could not explain or justify Bankshares's decision not to implement the diversifications by the June 30, 2009 deadline for the obvious reason that the November 2009 diversification elections were non-existent in June.[23]  The court cannot disregard, however, the November 2009 diversification elections; they existed during the administrative claims review process, and the Plan administrator undisputedly relied upon those elections for Bankshares's position that the Bryants had revoked their prior diversification elections.  In this context, the November 2009 diversification elections must be considered.  *See Till*, 2017 WL 393257, at *3 ("This Court, in line with several other Circuit Courts of Appeal, will consider only the reasonableness of an administrator's final decision." (citing *Glazer v. Reliance*

---

[23] There was a nearly five-year delay between June 30, 2009, and March 2014, when the Bryants initiated their administrative claims under the Plan's procedures.

*Standard Life Ins. Co.*, 524 F.3d 1241, 1245 (11th Cir. 2008), and *Khoury v. Grp. Health Plan, Inc.*, 615 F.3d 946, 952 (8th Cir. 2010)); *see also Harvey v. Standard Ins. Co.*, 503 F. App'x 845, 849 (11th Cir. 2013) ("[O]nly the record before Standard during its consideration of Harvey's initial claim or administrative review thereon is relevant.").

### b.    Waiver of Pension Benefits

It was not reasonable for the Plan administrator to conclude that the Bryants' November 2009 diversification elections amounted to waivers of their previous invocation of their rights to pension benefits (*i.e.*, a diversification election that included a put option on the distribution of shares subject to the election).  Although the parties cite no law on the pages of their briefs where they make these arguments, there is a general body of law addressing waivers of pension benefits that is relevant to the analysis.  Defendants contend, in essence, that, when the Bryants changed their diversification elections in November 2009, they waived their rights under the Plan to diversify their investments and receive a distribution of a percentage of the stock in their individual ESOP accounts.  "The validity of a waiver of pension benefits under ERISA is subject to closer scrutiny than a waiver of general contract claims." *Sharkey v. Ultramar Energy Ltd., Lasmo plc, Lasmo (AUL Ltd.)*, 70 F.3d 226, 231 (2d Cir. 1995).  "The essential question is whether, in the totality of the

circumstances, the individual's waiver of his right can be characterized as knowing and voluntary." *Id.* There are six factors a court should consider in evaluating purported waivers of ERISA rights:

> 1) the plaintiff's education and business experience, 2) the amount of time the plaintiff had possession of or access to the agreement before signing it, 3) the role of plaintiff in deciding the terms of the agreement, 4) the clarity of the agreement, 5) whether the plaintiff was represented by or consulted with an attorney, [as well as whether an employer encouraged the employee to consult an attorney and whether the employee had a fair opportunity to do so] and 6) whether the consideration given in exchange for the waiver exceeds employee benefits to which the employee was already entitled by contract or law.

*Finz v. Schlesinger*, 957 F.2d 78, 82 (2d Cir. 1992) (citation omitted); *see also Smart v. Gillette Co. Long–Term Disability Plan*, 70 F.3d 173, 181 n.3 (1st Cir. 1995) (treating the Second Circuit's list of factors as "helpful rather than conclusive").

The court applies the arbitrary-and-capricious standard of review to the Plan administrator's decision that the Bryants were not entitled to diversify their investments because, in November 2009, they changed their elections to keep their shares in the Plan. The principal focus of this analysis is not whether the Bryants effected a valid waiver of the rights to diversify their elections, but whether it was reasonable for the Plan administrator to conclude that they had done so. Of course, the former issue necessarily informs the analysis of the latter issue. With that in mind, the court turns to the factors set out above.

The third, fourth, fifth, and sixth factors easily answer the inquiry in the Bryants' favor. As to the third factor, Bankshares unilaterally eliminated the Plan's requirement that distributions made in accordance with a diversification election were subject to a put option calculated based on "the fair market value as of the Annual Valuation Date which precedes the date the put option is exercised," (Plan § 5.8(a), (b).) There is no evidence that Bankshares gave the Bryants any choice in these terms or role in deciding these terms.

As to the fourth factor, there is no language in the Bankshares' November 2, 2009 letter to participants, updating them on the financial deterioration of the ESOP, or in the November 2009 diversification-election forms, suggesting that the Bryants were releasing any rights under the Plan to a diversification election that included a put option with a price based on the December 31, 2008 valuation date. *See also Krackow v. Dr. Jack Kern Profit Sharing Plan*, No. 00 Civ. 2550, 2002 WL 31409362, at *7 (E.D.N.Y. May 29, 2002) (finding that an ERISA claim had not been waived where the release did not contain "clear and unambiguous" language); *Stewart v. Project Consulting Servs., Inc.*, No. 99 Civ. A. 3595, 2001 WL 1334995, at *3 (E.D. La. Oct. 26, 2001) (rejecting a waiver claim where the contract "does not contain an expression by plaintiff that he will not pursue benefits nor that he relinquishes any right to claim such benefits under ERISA"). Hence, under the

59

fourth factor, the court finds that there is a complete absence of clarity in the forms that the Bryants were waiving their rights to benefits under ERISA.

As to the fifth factor, there was no provision in the November 2, 2009 letter or the election form that encouraged Plaintiffs to consult an attorney before changing their election. And neither Plaintiff signed an acknowledgment that they had fully read and understood that they were giving up rights to Plan benefits. [24]

As to the sixth factor, the Bryants received no consideration in exchange for signing the November 2009 elections. Rather, the retraction of a diversification election accompanied by a put option was a financial detriment to the Bryants.

Even if the first two factors are neutral or weigh in Defendants' favor, the third, fourth, fifth, and sixth factors outbalance those factors and reveal that the Plan administrator acted arbitrarily and capriciously in opining that Plaintiffs had given up their rights to pursue a diversification election that included a put option when they signed the November 2009 diversification election.

---

[24] It is not clear that the Plan administrator even had the authority to secure a waiver of an ESOP participant's right to a diversification election that included a put option. *See Williams v. Cordis Corp.*, 30 F.3d 1429, 1431 (11th Cir. 1994) ("A pension plan is a unilateral contract which creates a vested right in those employees who accept the offer it contains by continuing in employment for the requisite number of years."); *cf. Holt v. Winpisinger*, 811 F.2d 1532, 1541 (D.C. Cir. 1987) (ERISA vesting provisions cannot be waived). Without any briefing on the issue from the parties, however, the court declines to dive into the murky waters of ERISA law governing non-forfeitable benefits.

### 4. *Summary*

The Plan administrator's decision to suspend the implementation of diversification elections pending an interim stock valuation was arbitrary and capricious: (1) As Plan participants, the Bryants were eligible to diversify a portion of their Plan account for a period of 90 days in the election period at issue; (2) after Plaintiffs timely submitted their diversification requests, the Plan administrator had ninety days from the close of the annual election period (*i.e.*, until June 30, 2009) to distribute shares in accordance with their diversification elections; (3) thereafter, Plaintiffs had the right to exercise a put option and require Bankshares to buy back the shares at the price set by the December 31, 2008, Annual Valuation; (4) the Plan provided no provision that permitted an interim valuation or that allowed the Plan administrator discretion to fail to implement a diversification election upon a proper election; and (5) the Plan's general provision outlining a Plan administrator's fiduciary obligations did not override the specific and mandatory Plan terms in §§ 5.8 and 8.3.

Furthermore, the Plan administrator's decision that it could deny Plaintiffs the Plan's right to diversify election based upon the November 2009 forms in which they changed their elections to keep their shares invested in the Plan is arbitrary and capricious. There is not a reasonable basis to support the Plan administrator's

conclusion that the November 2009 elections was, in essence, a waiver of benefits promised to Plaintiffs under the Plan.

**C.    Step Four**

Step Four of the six-part *Firestone* test provides that, "if no reasonable grounds exist, then end the inquiry and reverse the administrator's decision." *Blankenship*, 644 F.3d at 1355.   The Plan Administrator's decision to deny Plaintiffs' claims and the subsequent administrative appeals ratifying those decisions are subject to reversal.   Accordingly, on liability, Plaintiffs' summary judgment motion on the § 1132(a)(2) claim is due to be granted, while Defendants' summary judgment motion on this count is due to be denied.

**D.    Relief**

**1.    *The Recovery of Benefits***

The issue turns to relief.  In the Eleventh Circuit, § 1132(a)(1)(B) "confers a right to sue the plan administrator for recovery of benefits."   *Hamilton v. Allen-Bradley Co.*, 244 F.3d 819, 824 (11th Cir. 2001); *Garren v. John Hancock Mut. Life Ins. Co.*, 114 F.3d 186 (11th Cir. 1997) (employer, as plan administrator, was proper party defendant).   The Eleventh Circuit also has held that an action to recover benefits under § 1132(a)(1)(B) is "equitable in nature."   *Hunt v. Hawthorne Assocs., Inc.*, 119 F.3d 888, 907 (11th Cir. 1997) (characterizing the plaintiff's ERISA claim

for benefits under § 1132(a)(1)(B) as an equitable claim "for the enforcement of the ERISA plan" in contrast to an action for a money judgment). Proper relief under § 1132(a)(1)(B) includes an injunction requiring payment of accrued plan benefits, which here "must issue against" the plan administrator. *Id.* at 908.

Plaintiffs contend that the Plan administrator failed to honor their April 2009 diversification requests by June 30, 2009, as mandated by § 8.3 and that, therefore, they did not have an opportunity under § 5.8 to exercise their put option and receive cash for their diversified shares of stock. Accordingly, Plaintiffs seek benefits in the form of a distribution of shares that is subject to a put option. They also contend that the fair market value of the put option is that fixed by the December 31, 2008 annual valuation (*i.e.*, $11.00 per share). (*See* Pls.' Summ. J. Mot., at 36–37 (Doc. # 57).)

Defendants contend that, if liability is established, Plaintiffs are entitled only to "the distribution of a portion of the shares in their account, not cash." According to Defendants, Plaintiffs "have presented no evidence that they have exercised the 'put option' or that there is any obligation by Bankshares or the Plan to purchase their shares." Alternatively, Defendants contend that the September 30, 2009 special valuation of "$2.30 per share should be used to determine the value of the portion of

[Plaintiffs'] account[s] subject to diversification."  (Defs.' Resp. in Opp. to Pls.' Summ. J. Mot, at 60–61 & n.13).)

As a threshold issue, the parties' arguments ignore the elephant in the Complaint.  Count One—the § 502(a)(1)(B) claim—requests only legal relief, namely, "damages, including actual and punitive . . . ."  (Compl., at 8.)  However, Defendants have not challenged the sufficiency of Count One on the ground that ERISA precludes the form of relief that it requests.  Because the record reveals no suggestion of unfair surprise to Defendants, Count One will be construed as containing a request for an injunction ordering the payment of accrued benefits under the Plan.  *Cf.* Fed. R. Civ. P. 15(b)(2) ("When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings.").

Bankshares, as the Plan administrator, is liable under § 1132(a)(1)(B) for the benefits that Plaintiffs did not receive as a result of Bankshares's failure to distribute the shares of stock in satisfaction of Plaintiffs' diversification elections by June 30, 2009.  Those benefits encompass the put option, which would have permitted the Bryants to obtain cash in lieu of stock shares at the $11.00 share price fixed by the December 31, 2008 annual valuation.  (*See* Plan, § 5.8(b) ("The price at which the put option shall be exercisable is the fair market value as of the Annual Valuation

Date which precedes the date the put option is exercised.").)  Although Defendants

urge a $2.30 share price, the interim valuation set that price, and, as discussed in Part

V.B.2.a., the Plan contains no provision permitting an interim valuation for purposes

of implementation of a put option.

Defendants also argue that the Bryants never exercised their rights to a put

option under § 5.8 of the Plan and, thus, Bankshares did not deny them those rights.

But the logic of this argument is flawed, if not disingenuous.  The Plan administrator

prevented Plaintiffs from exercising their rights to a "put option" under § 5.8 by

failing to distribute the shares covered by Plaintiffs' diversification elections.  The

distribution of the shares is the event that activated the right of the put option.  (*See*

Plan, § 5.8(a) ("Any Participant . . . receiving a distribution of Company Stock from

the Plan at a time when such Company Stock is not readily tradeable on an

established market shall have a "put option" on such shares, giving him the right to

have the Company purchase such shares.").  The Bryants' predicament is of

Bankshares's making; Bankshares owns it.

Defendants' related argument is that the full spectrum of benefits that

Plaintiffs can recover is a distribution of shares under § 8.3.  Defendants are correct

that § 8.3 only permits a distribution of shares, not cash, but § 8.3 cannot be divorced

from § 5.8.  As discussed in other parts of this opinion, concomitant with an eligible

participant's right to make a diversification election during each plan year of the qualified election period and to direct the Plan Administrator to distribute or transfer the shares covered by the election was the Plan's guarantee to an eligible participant to a put option on the distributed shares. The court recognizes that the employer (Bankshares), not the Plan, was obligated to buy back the shares, but the Plan administrator had a duty to ensure that the participant had the opportunity to elect the put option. Another district court, in awarding benefits under § 1132(a)(1)(B) to an ESOP participant, persuasively reasoned that a put option payable by the employer, not the Plan, is a recoverable benefit. *See Craig v. Smith*, 597 F. Supp. 2d 814, 830 (S.D. Ind. 2009) (The ESOP "gave [the participant] the right to put his shares to the company. Even though the company had to pay for the shares, the ESOP had to ensure that the put option was exercised properly. It did not do so in this case, so the ESOP is liable for benefits that Craig would have received if it had followed the Plan.").

The amount of benefits to which Plaintiffs are entitled hinges on the number and value of the shares of stock each Plaintiff possessed as of the December 31, 2008 annual valuation. The account balance statements reflect that (1) Mr. Bryant owned approximately 9,197.930607 shares of Bankshares's stock in his ESOP as of January 1, 2009, and (2) Mrs. Bryant owned 880.205842 shares of Bankshares stock in her

ESOP as of January 1, 2009. (Bryants' ESOP Account Balances (Doc. # 57-25).)

The fair market value of Bankshares's stock as of the December 31, 2008 valuation

was $11.00 per share.

Section 8.3 of the Plan entitled Mr. Bryant to diversify fifty percent of the

employer securities in his account, which would have equaled approximately 4,599

shares of stock. Exercising the put option at $11.00 per share, Mr. Bryant would

have received $50,589. Mrs. Bryant was entitled to diversify twenty-five percent of

the employer securities in her account, which would have equaled approximately

220 shares of stock. Exercising the put option at $11.00 per share, Mrs. Bryant

would have received $2,420.[25] Accordingly, Plaintiffs are entitled to an injunction

ordering Bankshares to pay benefits in the foregoing amounts.

## 2. *Prejudgment Interest*

Plaintiffs request an award of prejudgment interest. "The award of an amount

of prejudgment interest in an ERISA case is a matter committed to the sound

discretion of the trial court." *Florence Nightingale Nursing Serv., Inc. v. Blue

Cross/Blue Shield of Alabama*, 41 F.3d 1476, 1484 (11th Cir. 1995) (citation

---

[25] Plaintiffs' calculations are erroneous. Plaintiffs calculate the diversification elections based upon the total of the cash and shares in each Plaintiff's account, but the Plan did not permit a diversification of the cash, only the securities. (Pls.' Summ. J. Mot., at 36–37 (Doc. # 57).) This may explain why Plaintiffs then offset the totals by the distributions they received on June 23, 2011, of the cash in their accounts. (Receipt of Pls.' ESOP Cash Distributions (Doc. # 57-32 at 3).)

omitted)). "This judicial discretion encompasses not only the overarching question—whether to award prejudgment interest at all—but also subsidiary questions that arise after the court decides to make an award, including matters such as the period and rate to be used in calculating interest." *Cottrill v. Sparrow, Johnson & Ursillo, Inc.*, 100 F.3d 220, 223 (1st Cir. 1996) *abrogated on other grounds by Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242 (2010).

Plaintiffs are entitled to an award of prejudgment interest. Prejudgment interest will permit Plaintiffs to receive full compensation for their losses and will ensure that the Plan administrator does not obtain "a windfall as a result of its wrongdoing." *Slupinski v. First Unum Life Ins. Co.*, 554 F.3d 38, 54 (2d Cir. 2009). This leaves the issues concerning the rate of prejudgment interest and the date of the accrual of prejudgment interest.

ERISA does not embody a provision providing for prejudgment interest. In *Florence Nightingale Nursing Serv., Inc. v. Blue Cross/Blue Shield of Alabama*, 41 F.3d 1476 (11th Cir. 1995), an ERISA case involving a skilled home nursing care providers' claim for health benefits Blue Cross and Blue Shield of Alabama refused to pay, the Eleventh Circuit held that "[i]t was clearly within the district court's discretion to use § 27-1-17(b) [subsequently renumbered (c)] as an analogy to fill a

gap in ERISA law." *Id.*; *see also* Ala. Code § 27-1-17(c) (providing the rate of interest an insurer must pay if it denies a claim for invalid reasons).

Plaintiffs assert that they are entitled to an award of prejudgment interest at a rate of 1.5 percent per month (18 percent per annum). This is the rate allotted in § 27-1-17(c), although Plaintiffs do not cite this statute. (Pls.' Summ. J. Mot., at 37.) The court finds that prejudgment interest rate of 1.5%, by reference to § 27-1-17(c), is appropriate in this case involving the wrongful denial of pension benefits under ERISA. Accordingly, prejudgment interest will be calculated at the rate of 18 percent per annum for the time period during which Plaintiff was wrongfully denied benefits under the policy.

The issue now turns to the accrual date for the award of prejudgment interest. Defendants persuasively argue that the Bryants are at fault for much of the delay in this action. They contend that Plaintiffs "inexplicably waited three years to file their first lawsuit in 2012 and five years to exhaust the Claims Procedure in 2014." (Defs.' Resp. in Opp. to Pls.' Summ. J. Mot., at 61 (Doc. # 61).)

The court agrees that Plaintiffs bear primary responsibility for the delay in pursuing their administrative remedies. Their first lawsuit resulted in dismissal because Plaintiffs had "failed to sufficiently allege a lack of 'meaningful access' to the Plan's administrative review procedures such that their failure to exhaust should

be excused." *Bryant v. Community Bankshares*, No. 2:12-CV-562-MEF (M.D. Ala. March 3. 2014) (Order dismissing Bryants' ERISA action for failure to exhaust administrative remedies (Doc. # 40)).  The court explained:

> In short, the Bryants could have pursued their administrative remedies after they learned that their diversification requests had not been completed by June 30, 2009.  They could have done this before November 2009, when their participation in the Plan was terminated (and when, at least according to some of the Bryants['] allegations, the Plan itself was terminated), or before June 11, when the remaining cash assets in the Plan were distributed and the Plan was "effectively" terminated.  The[ ] Bryants chose not to and have not clearly and positively demonstrated to the Court that it would have been futile for them to do so.

*Id.* at 8.

To account for this delay, the court finds that the unique circumstances of this case justify an accrual of prejudgment interest from the date that the Bryants initiated the administrative claims process.  That process began by letters dated March 12, 2014, in which Plaintiffs' counsel submitted a written claim to the Plan administrator, contending that the plan administrator had breach its contractual obligation to diversify the Bryants' accounts.  (Pls.' March 12, 2014 Claim for Benefits, at 3 (Doc. # 1-9).)

Accordingly, Plaintiffs' request for prejudgment interest is due to be granted. Plaintiffs are entitled to prejudgment interest at a rate of 1.5% per month (18% annually) from March 12, 2014, to the date of final judgment.

## E.    Attorney's Fees

Plaintiffs seek an award of attorney's fees under 29 U.S.C. § 1132(g)(1). This statute "provides no presumption in favor of granting attorney's fees to a prevailing claimant in an ERISA action." *Freeman v. Cont'l Ins. Co.*, 996 F.2d 1116, 1119 (11th Cir. 1993). A fee award "to either party" is within the district court's "discretion," § 1132(g)(1), provided the fee claimant demonstrates "some degree of success on the merits." *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 255 (2010) (citation omitted). The following factors are relevant for the determination of whether a successful claimant is entitled to an award of attorney's fees:

> (1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy an award of attorney's fees; (3) whether an award of attorney's fees against the opposing parties would deter other persons acting under similar circumstances; (4) whether the parties requesting attorney's fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; (5) [and] the relative merits of the parties' positions.

*Wright v. Hanna Steel Corp.* 270 F.3d 1336, 1344 (11th Cir. 2001); *see also Cross v. Quality Mgmt. Grp., LLC*, 491 F. App'x 53, 55 (11th Cir. 2012) (concluding that *Hardt* "allow[s] for the application of the five factors before a district court

ultimately determine[s] a party's entitlement to fees" and observing that *Hardt* specifically "sanctioned the district court's secondary use of the five-factor test"). "No one of these factors is necessarily decisive, and some may not be apropos in a given case, but together they are the nuclei of concerns that a court should address." *Plumbers & Steamfitters Local No. 150 Pension Fund v. Vertex Constr. Co.*, 932 F.2d 1443, 1452 (11th Cir. 1991).

Considering the above factors, the court finds that, while Plaintiffs achieved "some degree of success on the merits," *Hardt*, 560 U.S. at 255, an award of attorney's fees is not appropriate. First, a searching review of the record reveals no bad faith on the part of the Plan administrator. The Plan administrator was in a tough position. Bankshares's stock was declining rapidly, as confirmed by the September 2009 interim valuation; the ESOP's financial integrity was at grave risk; and the Plan administrator endeavored to be fair to all 459 of the ESOP participants. The Plan administrator's decisions were contrary to the specific and mandatory language of the Plan; thus, some culpability attaches. But there is no indication that bad faith factored into the decisions. Second, it is unlikely that an award of attorney's fees would deter other ESOP Plan administrators, given the unique financial circumstances confronting Bankshares in 2009. Third, there is no argument or evidence that other eligible participants of an ESOP would derive a benefit from an

award of attorney's fees to Plaintiffs.  Fourth, this case does not involve a significant legal question regarding ERISA itself.  The relative positions of the parties reveal culpability only in legal interpretation of facially ambiguous language in the Plan.  This order reverses that error.  That error in judgment alone does not foretell an award of attorney's fees under the *Wright* factors.

Accordingly, Defendants' summary judgment motion as to Count Three, which is Plaintiff's request for attorney's fees, is due to be granted, while Plaintiffs' summary judgment motion on Count Three is due to be denied.

## VI.  CONCLUSION

For the foregoing reasons, it is ORDERED as follows:

(1)    The motion for summary judgment (Doc. # 57), filed by Plaintiffs, is GRANTED on their claims to enforce Plan rights and for benefits under § 1132(a)(1)(B) in Count One of the Complaint against Defendant Community Bankshares, Inc.  Plaintiffs' motion for summary judgment (Doc. # 57) otherwise is DENIED.

(2)    Defendants' motion for summary judgment (Doc. # 58) is DENIED on Count One and GRANTED on Count Three, which is Plaintiffs' request for attorney's fees.  Defendants' motion for summary judgment (Doc. # 58) is DENIED as moot on Count Two.

(3)     Plaintiffs' motion to dismiss Count Two (Doc. # 62, at 15) is GRANTED, and Count Two is DISMISSED with prejudice.

(4)     Prejudgment interest is awarded at a rate of 1.5 percent per month (18 percent annually) from March 12, 2014, to the date of final judgment.

(5)     Plaintiffs shall show cause, on or before **September 22, 2017**, why their claims to enforce Plan rights and for benefits under § 1132(a)(1)(B) in Count One should not be dismissed with prejudice as to Defendants The Estate of Steven A. Adams, Edwin B. Burr, Elton Collins, Wesley A. Dood, Jr., and Mary Wilkerson.

A final judgment will be entered separately after resolution of (5).

DONE this 12th day of September, 2017.

                         /s/ W. Keith Watkins
                         CHIEF UNITED STATES DISTRICT JUDGE